STATE *vs.* BARTLETT F. FEENEY.

JULY 25, 1940.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

Moss, J.   This is an indictment for larceny, wherein the defendant is charged with stealing, on divers dates between July 1, 1938 and September 21, 1938, from the International Braid Company, a corporation, 12,000 pounds of braid of the value of $4800.   At the trial in the superior court the jury returned a verdict of guilty.   A motion for a new trial was denied and the case is now before us on the defendant's bill of exceptions, stating a large number of exceptions.

At the trial in the superior court evidence of the following facts was introduced, mostly by the state, but in part by the defendant or both.   Up to the time of his arrest on the charge involved in this case, he had been for about twenty-six years employed by this braid company as a truck driver in connection with one of its plants in the city of Providence in this state, where it manufactured cotton braid.   It was a part of his duties, on Saturdays, to haul away the rubbish and waste which had accumulated at the plant during the week and had been collected during the day before.

He stated that a good part of this waste was salable and that for years he had been in the habit of selling it, for substantial sums of money, to a firm, composed of H. Goldberg and his son, which carried on in the city of Central Falls a business of dealing in cotton waste.   There was evidence for the state that the braid company knew nothing about such sales of waste being made by him.   In connection with his duties he had had the use of a key to the company's garage and the gate to its yard at its plant.   This key also unlocked the door to its warehouse, where large quantities of the braid manufactured by it were stored.

Some time early in 1939, the company was informed by one of its New York City customers that a dealer in that city

was selling braid, which was apparently of the International Braid Company's make, at a price of twenty-three cents a pound, while the regular price of such braid was about fifty cents a pound. Through this customer, some samples of the braid which was thus being sold by the New York dealer were obtained by the company and were, by tests, determined to be of the company's make. Upon investigation by the police department of Providence, it was ascertained that a large quantity of this braid, approximately 12,000 pounds, was in the possession of the New York dealer; and this was brought to Providence from New York.

The younger Goldberg and his sister, who was bookkeeper for the Goldberg firm, and three other employees of the firm positively identified the defendant as the man who, under the name of "Maguire", had delivered this braid, in trucks, to their place of business, nearly always on Saturdays, for a considerable period of time, including the period specified in the indictment. During this latter period, according to the evidence, about 6000 pounds had been so delivered.

Goldberg, the son, testified that this braid was sold to them by the defendant in lots usually of 200 to 400 pounds, at prices varying from twelve to sixteen cents per pound; that 12,000 pounds of it were sold by the Goldberg firm to the dealer in New York above mentioned and shipped to that dealer; and that about 1500 to 1800 pounds had been later found at their own place of business and were delivered to the police. The testimony, corroborated by the account books of the Goldberg firm, showed that during the months of July, August and September of 1938, respectively, the defendant, under the name of Maguire, had been paid for such braid $276.10, $280.50 and $215.60.

Most of this testimony was contradicted by the defendant and there were some inconsistencies in it. On the other hand, the defendant himself admitted in his testimony that when, before the indictment, the younger Goldberg, at the

office of the braid company, identified the defendant as the man who as Maguire had been selling braid to the Goldberg firm, he himself denied that he had ever before seen the younger Goldberg. In like manner when, a little later, he was similarly identified by the senior Goldberg and his daughter, separately, he himself denied that he had ever seen either one of them. Yet, as above stated, he admitted in his testimony that he had been for years selling, to the Goldberg firm, waste from the plant of the braid company.

The twenty-fourth, twenty-fifth, twenty-sixth and twenty-seventh exceptions are similar to one another and raise practically only one question. In the course of the direct examination of the defendant he was asked by his attorney whether he had any children. This was objected to by the attorney for the state on the ground of immateriality. The trial justice overruled the objection and the defendant answered that he had five children, but that was as far as the court permitted defense counsel to go.

On cross-examination he was asked by the attorney for the state to give the names of these five children and he did so after an objection by his attorney had been made and overruled and an exception noted. He was then asked where the first one was, and this question was ruled out by the trial justice on the ground of immateriality. He was then asked by the attorney for the state whether the children were all of age and answered that they were. He was next asked whether they were all working; an objection was made and overruled and an exception noted; and then the defendant answered that three of them were.

He was next asked by the attorney for the state what the other two were doing; an objection was made and overruled and an exception was noted; and then the defendant replied: "There is one at home and the other is in prison." His attorney at once moved that a mistrial be declared. This motion, after some discussion, was denied by the trial justice, who

stated that he would instruct the jury about the matter; and an exception was taken by the defendant's attorney.

The trial justice at that time said nothing to the jury about this matter; but in his instructions to them, at the close of the trial, he told them that the question for them to decide was what the defendant had done and not what his son may have done; that the fact that one of the defendant's children was in prison had nothing to do with this case; and that they should not give any consideration to that fact.

After considering, in the light of the evidence in this case, the question raised by these exceptions, we are of the opinion that the trial justice ruled erroneously in permitting the attorney for the state to ask, in spite of the objections of the defendant's attorney, the questions that are covered by these exceptions; and we are also of the opinion that the rulings thus made constituted error that was prejudicial to the defendant and that the prejudice was not removed by the instructions which the trial justice, in his charge, gave to the jury with regard to this matter.

We therefore are of the opinion that these exceptions should be sustained; and as they are decisive of the case, as it is now before us, and the sustaining of them entitles the defendant to a new trial, we see no sufficient reason, under all the circumstances, for discussing any of the other numerous exceptions relied upon by the defendant.

The twenty-fourth, twenty-fifth, twenty-sixth and twenty-seventh exceptions of the defendant are sustained, and the case is remitted to the superior court for a new trial.

*Louis V. Jackvony,* Attorney General, *Fred A. Otis,* Asst. Atty. Gen., for State.

*Albert N. McKendall,* for defendant.